

AUSA: Regina R. McCullough                    Telephone: (313) 226-9618
(08/09) Criminal Complaint        Special Agent    : Larissa Kramer        Telephone: (313) 965-5509

# UNITED STATES DISTRICT COURT
for the
### Eastern District of Michigan

**ORIGINAL**

United States of America,

       Plaintiff,

v.

D-1 DR. RODNEY MORET-QUEZADA,
D-2 JELLIE VILLALON,
D-3 JORGE AZAR,

       Defendant(s).

Case:2:15-mj-30513
Judge: Unassigned
Filed: 10-27-2015 At 11:55 AM
SEALED MATTER (LH)

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief:

On or about the date(s) of June 2010 to the present_____, in the county of Oakland_____
in the Eastern_____ District of Michigan_____, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. Sections 1347 & 1349 | Conspiracy to Commit Health Care Fraud |
| 21 U.S.C. Sections 841(a)(1) & 846 | Conspiracy to Possess With Intent to Distribute Controlled Substances |

This criminal complaint is based on these facts:

☑ Continued on the attached sheet.

_____
Complainant's signature

Special Agent Larissa Kramer
Printed name and title

Sworn to before me and signed in my presence.

Date: October 27, 2015_____

_____
Judge's signature

City and state: Detroit, Michigan_____

Anthony Patti, United States Magistrate Judge
Printed name and title

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A COMPLAINT AND ARREST WARRANT

I, Larissa Kramer, Special Agent for the Federal Bureau of Investigation, being duly sworn, depose and state as follows:

## INTRODUCTION

I am a Special Agent with the Federal Bureau of Investigation (FBI), duly appointed according to law and acting as such, and have been employed as such since June 2006. As a Special Agent in the FBI, I have received general law enforcement training at the FBI Academy, as well as specialized training on the subjects of health care fraud, money laundering and telephone analysis from the FBI, and I have been personally involved in investigations concerning health care fraud, prescription drug diversion and methods used to finance and conceal the profits of those operations. I have interviewed numerous self proclaimed drug users, medical doctors, and owners and employees of medical clinics. I have investigated and conducted surveillance on numerous doctors, pharmacies and prescription drug dealers. I have consulted with agents and officers of numerous federal, state, and local agencies in gaining an understanding of current trends in the diversion of prescription drugs and health care fraud. I am familiar with the Medicare program, as well as the federal healthcare fraud and narcotics trafficking laws. I am currently assigned to the Detroit division of the FBI and my duties include investigating health care fraud and prescription drug diversion. I am assigned to an investigation pertaining to health care fraud and the diversion of controlled substances by Dr. RODNEY MORET-QUEZADA (MORET), JELLIE VILLALON (VILLALON), JORGE AZAR (AZAR), ADVANCED CARE SERVICES, and others not named. The information herein is known to me through personal knowledge and investigation and/or from review of documents and

1

interviews of people having direct knowledge of these events. This affidavit does not include every fact that is known to me.

This Affidavit is respectfully submitted in support of a complaint and arrest warrant for RODNEY MORET-QUEZADA, MD, date of birth, August 23, 1950, who resides at 28500 Alden, Madison Heights, Michigan, JELLIE VILLALON, date of birth May 10, 1967, who resides at 4531 NW 207th Drive, Miami Gardens, Florida, and JORGE AZAR, date of birth January 6, 1966, who resides at 4531 NW 207th Drive, Miami Gardens, Florida,. This request is based on probable cause that Dr. MORET, VILLALON, AZAR, and others not named, conspired to dispense and divert, in excess of 1 million tablets of controlled substances and in excess of 2.6 million milliliters of controlled substances, specifically, 393,000 tablets of Schedule II controlled substances, 585,000 tablets of Schedule III controlled substances, 257,000 tablets of Schedule IV controlled substances, and 2.6 million milliliters of Schedule V controlled substances, respectively, in violation of Title 21, United States Code, Sections 846 and 841(a)(1), by knowingly issuing prescriptions for controlled substances without medical necessity and outside the scope of professional practice and conspired to commit, and did commit, Health Care Fraud, in violation of Title 18, United States Code, Sections 1349 and 1347, by , by billing the Medicare program for services which were not medically necessary and/or were not rendered.

The source of your affiant's information and the grounds for your affiant's belief are as follows:

## SUMMARY OF INVESTIGATION

1. Your affiant, personally, and in conjunction with other law enforcement agencies, has been involved in the investigation of allegations that Dr. RODNEY MORET-QUEZADA (hereafter MORET), JELLIE VILLALON, and JORGE AZAR, and others, are utilizing ADVANCED CARE SERVICES (hereafter ACS), a private medical practice, in the diversion of hydrocodone, alprazolam, promethazine with codeine, and other controlled substances, in a scheme to defraud the Medicare program and other insurance companies.

## VIOLATION STATUTES

2. 21 U.S.C. § 841(a)(1), prohibits distribution of controlled substance: It shall be unlawful for any person knowingly or intentionally—
   (1) To manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense a controlled substance;

3. 21 U.S.C. § 846 provides that any person who attempts or conspires to manufacture, distribute, or dispense a controlled substance be subject to the same penalties as those proscribed in 21 U.S.C. § 841(a)(1).

4. 18 U.S.C. § 1347, prohibits health care fraud: Whoever knowingly and willfully executes, or attempts to execute, a scheme or artifice—
   (1) to defraud any health care benefit program; or
   (2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program, in connection with the delivery of or payment for health care benefits, items, or services, shall be fined under this title or imprisoned not more than 10 years, or both.

3

5.  18 U.S.C. § 1349 provides that any person who attempts or conspires to commit health care fraud shall be subject to the same penalties as those proscribed in 18 U.S.C. § 1347.

6.  18 U.S.C. § 24(b) defines a "health care benefit program" as, among other things, "any public or private plan . . . affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service, for which payment may be made under the plan."

## THE MEDICARE PROGRAM

7.  The Medicare Program (Medicare) is the federal health insurance program for the aged and disabled established by Congress in 1965, as Title XVIII of the Social Security Act and codified at 42 U.S.C. § 1395. Medicare is administered through the Centers for Medicare and Medicaid Services (CMS). CMS is a division of the United States Department of Health and Human Services.

8.  Medicare includes coverage under three primary components, hospital insurance (Part A), medical insurance (Part B) and prescription drug coverage (Part D). Part A covers physical therapy, occupational therapy, and skilled nursing services if a facility was certified by CMS as meeting certain requirements. Part B of the Medicare Program covers the cost of physicians, services and other ancillary services not covered by Part A. Part D, which must be combined with coverage from an insurance company or other private company approved by Medicare, covers prescription drugs.

    A. AdvanceMed, an NCI company, was the Program Safeguard Contractor for Medicare Part A and Part B in the state of Michigan

4

after June 1, 2015. Cahaba Safeguard Administrators, LLC (Cahaba) was the Program Safeguard Contractor for Medicare Part A and Part B in the state of Michigan from April 24, 2012 to May 31, 2015. Prior to April 24, 2012, the Program Safeguard Contractor for Medicare Part A and Part B in the state of Michigan was Trust Solutions, LLC (Trust Solutions).

B. Health Integrity, LLC. (Health Integrity) was the National Benefit Integrity Medicare Drug Integrity Contractor (NBI MEDIC) for Medicare Part D in the state of Michigan as of July 2015.

C. The basic requirement for any claim to be payable by Medicare is that the service must be "reasonable and necessary for the diagnosis or treatment of illness or injury." What is "reasonable and necessary" for certain conditions is defined based upon accepted practices in the medical community, as further defined by National Coverage Determinations issued by CMS and Local Coverage Determinations issued by the Medicare administrative contractor for the State of Michigan.

9. In order to bill the Medicare Part A or Part B Programs (or private insurance programs), a medical provider must bill for one, or more, Current Procedural Terminology (CPT) Code(s).   CPT Codes, which are developed and maintained by the American Medical Association (AMA), are individualized numbers which are assigned to every task or service a medical provider might perform on a patient.  CPT codes are then used by Medicare, and private insurance companies, to determine the amount of reimbursement, or payment, a medical provider will receive for the task or service performed on a patient.   As CPT codes are meant to ensure uniformity by the AMA, all

medical providers and insurance companies use the same set of CPT Codes which are updated annually.

## PRESCRIPTION DRUG DIVERSION

10. Controlled substance diversion, or prescription drug diversion, can best be defined as the diversion of licit drugs for illicit purposes. Based on experience and specialized training as a Special Agent, and experience in investigating similar drug diversion investigations, your Affiant is aware of prescribing patterns which are commonly seen by physicians prescribing controlled substances outside the course of legitimate medical practice and pharmacies dispensing these substances outside legitimate pharmacy practice. These patterns include, but are not limited to, multiple patients receiving the same combination of controlled substances; the use of multiple pharmacies by patients to fill prescriptions; individuals traveling outside of the area in which they live to obtain prescriptions; excessive numbers of identical prescriptions in different names prescribed by the same doctor and filled by the same pharmacy; patients obtaining excessive quantities of controlled substances over an extended period of time; patients obtaining similar prescriptions from multiple different doctors; patients receiving multiple prescriptions simultaneously for different opiate-based narcotics, or other substances with a known street desire; patients receiving prescriptions for the maximum dosage of a narcotic, or other controlled substance, with no titration ("ramp up") or trial period; patients of limited means paying for expensive narcotics with cash; doctors routinely prescribing the highest available dosage of a controlled substance; patients involved in drug distribution conspiracies obtaining medications from a specific doctor; and

6

doctors changing their prescribing habits in line with the current street
desire, or highest street value, of certain controlled substances.

11. Title 21, United States Code, () Section 822(a)(1) requires that every person
who manufactures or distributes a controlled substance must be registered by
the Attorney General of the United States. Such registrations are maintained
by the U.S. Drug Enforcement Administration (DEA), and the registrant's
activity with controlled substances is limited to the extent of his/her
registration. Title 21, United States Code, Section 802(21) defines a
"practitioner" as a physician, dentist, veterinarian, scientific investigator,
pharmacy, hospital or other person, licensed, registered or otherwise
permitted by the United States or the jurisdiction in which he practices or
does research, to distribute, dispense, conduct research with respect to,
administer, or use in teaching or chemical analysis, a controlled substance in
the course of professional practice or research.

12. Section 822(a)(2) requires that every person who proposes to dispense any
controlled substance, shall obtain from the Attorney General a registration
issued in accordance with the rules and regulations promulgated by him.
Title 21, United States Code, Section 802(10) defines the term "dispense" as
to deliver a controlled substance to an ultimate user or research subject by,
or pursuant to the lawful order of, a practitioner, including the prescribing
and administering of controlled substance for such delivery. Title 21, United
States Code, Section, 802(27) defines "ultimate user" as a person who has
lawfully obtained, and who possesses, a controlled substance for his own use
or for the use of a member of his household.

13. Title 21, Code of Federal Regulation, Section 1306.04(a) states that in order
for a prescription for a controlled substance to be effective it must be issued
for a legitimate medical purpose by an individual practitioner acting in the

usual course of his professional practice.  The responsibility for the proper
prescribing and dispensing of controlled substances is upon the prescribing
practitioner, but a corresponding responsibility rests with the pharmacist
who fills the prescription.  An order purporting to be a prescription issued
not in the usual course of professional treatment or in legitimate and
authorized research is not a prescription within the meaning and intent or
section 309 of the Controlled Substances Act (21 U.S.C. 829) and the person
knowingly filling such a purported prescription, as well as the person issuing
it, shall be subject to the penalties provided for violations of the provisions
of law relating to controlled substances.

14. The Controlled Substances Act (CSA) was enacted into U.S. law by
Congress in 1970, as part of Title 21. Drugs which are considered controlled
substances under the CSA are grouped into one of five "Schedules"
(Schedule I – Schedule V).  Substances assigned to Schedule I have no
currently accepted medical usage in the United States, and therefore may not
be prescribed by a doctor or filled by a pharmacist.

15. The U.S. Drug Enforcement Administration (DEA) has determined certain
prescription medications are "controlled" based on their potential for
addiction and abuse.  The DEA assigns a "Schedule" to these prescription
medications according to their potential for abuse and addiction, with a
controlled substance in Schedule II having the highest potential for addiction
and abuse, among all substances available for prescription.  Prescription
drugs which are "controlled" are assigned to Schedule II, III, IV, or V.

16. Hydrocodone bitartrate is an opioid-analgesic and/or antitussive which is
currently only available in combination with other ingredients, and different
combination products are prescribed for different uses.  Hydrocodone
bitartrate is commonly known for being combined with acetaminophen

8

(commonly known by the brand name Tylenol) to form a narcotic pain reliever tablet (commonly known by the brand names, Vicodin®, Lortab®, Lorcet®, and Norco®). This Hydrocodone bitartrate/acetaminophen combination is a Schedule II Controlled Substance as defined in Title 21 of the United States Code, and is used to relieve moderate to severe pain. Prior to October 6, 2014, hydrocodone combination products were regulated as a Schedule III controlled substance and are now regulated as a Schedule II controlled substance. Hydrocodone bitartrate/acetaminophen is available in approximately ten different dosage units with varying dosages of both the hydrocodone bitartrate portion and/or the acetaminophen portion. The available dosage portion of hydrocodone bitartrate, in any combination of dosage units, is 2.5mg, 5mg, 7.5mg, and 10mg. While various versions of this narcotic combination containing 10mg of hydrocodone bitartrate are often diverted, the most commonly diverted dosage unit of the hydrocodone bitartrate/acetaminophen combination is the 7.5mg/750mg (which contains 7.5 mg of hydrocodone bitartrate and 750mg of acetaminophen).

17. Alprazolam (commonly known by the brand name XANAX®) is a benzodiazepine and a Schedule IV Controlled Substance as defined in Title 21 of the United States Code. Alprazolam works by slowing down the movement of chemicals in the brain that may become unbalanced. This results in a reduction in nervous tension (or anxiety). Alprazolam is primarily intended to treat anxiety and/or panic disorders. Alprazolam is often used recreationally, or through addiction, due to its ability to cause the user feelings of relaxation, calm, or overall wellbeing. Alprazolam is available in four different dosage units, ranging from the smallest of 0.25mg, to the largest of 2mg. The most commonly diverted dosage units are the 1mg and 2mg versions which are often referred to as "footballs" and "bars,"

9

respectively, due to their physical shapes.  According to the manufacturer of XANAX®, Pfizer Inc. (Pfizer), psychological dependence is a risk with all benzodiazepines, including XANAX®, and withdrawal symptoms can range from mild dysphoria and insomnia to a major syndrome that may include abdominal and muscle cramps, vomiting, sweating, tremors and convulsions. Pfizer recommends that all patients on XANAX® who require a dosage reduction be gradually tapered under close supervision and addiction-prone individuals should be under careful surveillance when receiving XANAX®. Furthermore, Pfizer recommends a dosage range of 0.75mg to 4.0mg per day to treat transient anxiety and anxiety disorder.  Pfizer points out that the treatment of panic disorders often requires an average daily dosage in excess of 4mg; however dependence may be higher for panic disorder patients treated with average daily dosages in excess of 4mg.

18. Promethazine/codeine syrup (sold by the brand name Phenergan® with codeine) is a phenothiazine antihistamine and narcotic cough suppressant combination and a Schedule V Controlled Substance as defined in Title 21 of the United States Code.   Promethazine/codeine syrup is generally used for treating allergy symptoms, cough and other respiratory symptoms. The antihistamine works by blocking the action of histamine to reduce the symptoms of an allergic reaction, such as runny nose and sinus drainage. The cough suppressant works in the brain to decrease the cough reflex. Promethazine/codeine syrup, which is often referred to on the street as "codeine cough syrup" or simply "cough syrup" or "syrup," is often mixed with various flavors of soda or juice as a recreational drug, and is often used to dip marijuana cigarettes into to create a euphoric "high." Promethazine/codeine syrup is most commonly prescribed in liquid form by the milliliter.  When taken in large quantities, both promethazine and

10

codeine can lead to sedation and altered levels of consciousness.   Known
side effects of codeine include mental and respiratory depression, and known
side effects of promethazine include drowsiness, fatigue and decreased
motor coordination. Promethazine should not be taken with cold or allergy
medicine, sedatives, narcotic pain medication, sleeping pills, muscle
relaxers, or medication for depression or anxiety as it could cause medical
problems and increase side effects.

19. Through your Affiant's investigation of this and other drug diversion
conspiracies, your Affiant is aware of numerous individuals and
organizations of individuals in the greater Detroit, Michigan area diverting
hydrocodone bitartrate/acetaminophen, alprazolam, and/or
promethazine/codeine syrup for illegal sale within the state of Michigan
and/or outside  the state of Michigan.  These organizations often include, but
are not limited to: doctors or medical office workers who write the
prescriptions; pharmacists and pharmacy owners and/or workers who fill
these prescriptions without appropriate scrutiny; patient recruiters, who
bring patients to doctors; runners, who bring the prescriptions to pharmacies;
drug dealers or transporters who sell the pills and/or transport them to the
street market; and in some cases an individual who controls the organization.
An individual can act in any one or more of the above mentioned capacities
within these drug diversion conspiracies and organizations.

20. Through your Affiant's investigation of this and other drug diversion
conspiracies, your Affiant is aware of various street prices of the most
commonly diverted controlled substances.  While prescription substances
have varying street prices depending upon geographical location, as
mentioned above, your Affiant is aware of numerous organizations of
individuals in the greater Detroit, Michigan area diverting controlled

substances outside the state of Michigan to locations where the street prices for these controlled substances are often higher. Your Affiant has learned of the following prices which can be obtained by illegal street sales of the above mentioned narcotics:

    A. Hydrocodone Bitartrate/Acetaminophen – Prices of $5.00-$6.00 per tablet can often be obtained, or have been obtained for hydrocodone bitartrate/ Acetaminophen tablets.   Street prices of these tablets vary widely based upon  the amount of hydrocodone contained in the tablet.  While a 7.5/750mg tablet of Vicodin® will often sell for $5.00 or more, a Lortab® or NORCO® tablet containing 10mg of hydrocodone will often sell for $6.00 or more.

    B. Alprazolam - Prices of $2.00 per milligram, or more, can often be obtained, or have been obtained for alprazolam tablets.

    C. Promethazine/codeine syrup - Prices of up to $50.00 per liquid ounce (or 30 milliliters), can often be obtained, or have been obtained for promethazine/codeine syrup.

## CASE BACKGROUND

21. The investigation was predicated on a referral from Trust Solutions, a former Medicare contractor, showing a 100% denial rate of 32 reviewed claims for 309 line item services.  Trust Solutions identified ACS and Dr. MORET, a family practice doctor, as billing a high volume of infusion therapy current procedural terminology (CPT) codes and J-codes, as well as billing for Medicare beneficiaries with compromised insurance identification numbers. Infusion therapy is the injection of pharmaceuticals into patients.  J-codes are CPT codes used to report injectable drugs that cannot be self-

administered, such as chemotherapy, immunosuppressive drugs, and inhalation solutions.

22. According to the LARA website, Dr. MORET obtained a license to practice Medicine in the State of Michigan on July 5, 1994. Dr. MORET's medical license currently is active and set to expire on January 31, 2016.

23. Dr. MORET is currently registered under 21 U.S.C. § 822 as a practitioner, and he is currently assigned DEA registration number AM2503248 allowing him to prescribe drugs included on Schedules II-IV. Dr. MORET's DEA license is set to expire on January 31, 2016. As of May 18, 2015, Dr. MORET listed business address of 25180 Greenfield Road, Oak Park, Michigan on his DEA registration.

24. Dr. MORET was employed at JP ADVANCED SERVICES located in Livonia, Michigan until 2011. According to former employees, JP ADVANCED SERVICES provided infusion therapy to HIV patients and was owned and operated by AZAR and VILLALON.

25. The website of the Department of Licensing and Regulatory Affairs ("LARA") for the State of Michigan lists JP ADVANCED SERVICES as a domestic for-profit corporation with a registered address of 31705 Plymouth Road, Livonia, Michigan. JP ADVANCED SERVICES was incorporated on March 24, 2008 and was dissolved on February 27, 2012. AZAR was listed as the registered agent.

26. JP ADVANCED SERVICES closed in 2011 when AZAR and VILLALON relocated the clinic to 21580 Greenfield Road, Oak Park, Michigan. The clinic was re-incorporated at ACS. According to former employees, ACS is owned and operated by AZAR and VILLALON. VILLALON is also responsible for submitting all billing for ACS to Medicare.

27. The website for LARA for the State of Michigan lists ACS as a domestic non-profit corporation located at 21580 Greenfield Road, Oak Park, Michigan. ACS was established on August 9, 2010, "to provide support system and vitamin infusion treatment to individuals that are HIV positive." In the company's most recent corporate filing on record with LARA, a 2015 annual report, AZAR is listed as the authorized agent. In the 2014 annual report, AZAR is listed as the President and Director. VILLALON and Dr. MORET are also listed as Directors.

28. On December 13, 2010, AZAR filed a CMS 855 Medicare enrollment application on behalf of ACS. AZAR signed the certification statement as a "5% of Greater Direct Owner," indicating that he agreed, among other things, to abide by the Medicare laws, regulations, and program instructions, and that he understood that payment of Medicare claims is conditioned upon the claim and underlying transaction complying with such laws, regulations, and program instructions. By signing the certification statement, AZAR also agreed that he would not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and would not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

29. On December 13, 2010, VILLALON signed the certification statement on CMS 855 for the initial Medicare enrollment for ACS as a "Director/Officer" and Delegated Official, indicating that she agreed, among other things, to abide by the Medicare laws, regulations, and program instructions, and that she understood that payment of Medicare claims is conditioned upon the claim and underlying transaction complying with such laws, regulations, and program instructions. By signing the certification statement, VILLALON also agreed that she would not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare,

14

and would not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

30. VILLALON was identified on an Electronic Data Interchange (EDI) enrollment form as a "supervisor" at ACS on December 13, 2010, and as the "office manager" at ACS on February 13, 2013.

31. On September 3, 2013 (the most recent application on file), Dr. MORET filed an 855I form with CMS revalidating his provider enrollment in Medicare with ACS. Dr. MORET listed his correspondence address as 21580 Greenfield Road, Oak Park, Michigan. On the 855I, Dr. MORET identified his specialty as "family practice." Dr. MORET reassigned Medicare payments to ACS. VILLALON was listed as the contact person for Dr. MORET's provider application.

32. On the 855I, Dr. MORET signed the certification statement indicating that he agreed, among other things, to abide by the Medicare laws, regulations, and program instructions, and that he understood that payment of Medicare claims is conditioned upon the claim and underlying transaction complying with such laws, regulations, and program instructions. By signing the certification statement, Dr. MORET also agreed that he would not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and would not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

33. On the 855I, Medicare requires that the billing agency be identified if a separate billing agency or individual prepares and submits claims on behalf of the provider. Dr. MORET checked the box indicating that the section for billing agency information did not apply. Your Affiant is aware from interviews of former employees that VILLALON is responsible for the billing for ACS.

15

34. In order to receive reimbursement from Medicare, a provider must submit a claim, either electronically or using a form, containing the required information appropriately identifying the provider, beneficiary, and services rendered, among other things.   The provider can elect to receive reimbursement from Medicare via electronic funds transfer (EFT) by signing an authorization agreement utilizing form CMS-588.  ACS elected to receive reimbursement from Medicare via EFT and submitted form CMS-588. On the form VILLALON was listed as the Administrator and point of contact for ACS and listed her title as Administrator. All reimbursements from Medicare for ACS were deposited into bank account number XXXXXXXX3617. VILLALON and AZAR are the only authorize signatories on this account.

35. In July 2013, a patient (hereafter Patient 1) informed Special Agents of the FBI that he/she was a patient of Dr. MORET and had received medically unnecessary controlled substances from Dr. MORET three times prior to July 2013. Patient 1 learned about Dr. MORET from a patient recruiter.

36. In July 2013, an employee at Dr. MORET's clinic contacted Oak Park Police Department (OPPD) to report that a few men were outside the clinic attempting to purchase patients' medications.

37. Through your Affiant's investigation of this and other drug diversion conspiracies, your Affiant is aware that "patient recruiters" gather Medicare beneficiaries, or patients covered under an alternate medical insurance, in order to be seen by a doctor, or in some cases, a person employed by a doctor.  These patient recruiters are known to profit from the diversion and sale of narcotics prescribed to their patients by a doctor, or employee of a doctor.  The patients, or Medicare beneficiaries, are often compensated, in cash or narcotics, from the patient recruiter.

38. Your Affiant has learned that often times, when a Medicare Beneficiary is recruited to see a doctor who is engaging in the diversion of controlled narcotics, the Beneficiary does not realize that in exchange for the beneficiary being compensated in cash or controlled substances, the Beneficiary must be willing to let procedures which were not performed and/or were not medically necessary to be billed to the Beneficiary's Medicare coverage. Beneficiaries often learn of this "quid pro quo" after first filing a complaint with Medicare, the doctor's office, or the Patient Recruiter that may have recruited the Beneficiary. Once learning of this quid pro quo, the Beneficiary often continues to see the doctor in question, allowing further fraudulent billings to the Beneficiary's Medicare coverage, in exchange for continued compensation.

## MICHIGAN AUTOMATED PRESCRIPTION SYSTEM (MAPS)

39. On January 1, 2003, the state of Michigan instituted the Michigan Automated Prescription System (MAPS). MAPS requires all pharmacies in the state of Michigan to report on a monthly basis all controlled substance prescriptions filled at their pharmacy. These reports must be submitted to MAPS by the 15th day of the following month in which the prescription was filled. Controlled substance information reported to MAPS includes, but is not limited to, the following:

Patient Data:  Name, address, date of birth

Physician Data:  Prescriber's name and DEA number

Drug:  Name of controlled substance, strength, quantity, prescription number

17

Pharmacy Data:  Dispensing Pharmacy, location, state license number

40. The stated purpose of MAPS is to assist health professionals in the prevention of drug abuse and diversion of controlled substances. MAPS encourages prescribers to register for MAPS and to request a controlled substance prescription history on their patients.

41. MAPS reports are generated on a monthly basis to identify patients who cross certain thresholds. Letters and MAPS reports are mailed to the prescribers identified on the MAPS reports. MAPS recommends that providers who receive one of the letters review their records and request a MAPS report for the patient. MAPS also recommends contacting the other prescribers on the MAPS report to determine the legitimacy of the prescriptions and to address concerns of possible abuse.

42. Your Affiant has analyzed the MAPS data available on Dr. MORET for the period June 15, 2011 and September 15, 2015, and noted statistics including, but not limited to, the following:

    A. Hydrocodone Bitartrate / Acetaminophen statistics:

        i.    Between June 15, 2011 and September 15, 2015, pharmacies in the state of Michigan filled no less than 8,650 prescriptions for 780,744 tablets of hydrocodone bitartrate/acetaminophen prescribed by Dr. MORET.

        ii.    Of these 780,744 tablets, 84% were for tablets containing 10 mg of hydrocodone, and 16% were for tablets containing 7.5 mg of hydrocodone. The 7.5 mg and 10 mg hydrocodone dosage units are the highest available dosage of hydrocodone and the most commonly diverted dosage units.

        iii.    Between June 15, 2011 and September 15, 2015, pharmacies filled prescriptions for controlled substances prescribed by Dr.

MORET for 2,724 unique individuals. Of those 2,724 unique individuals, 2,287 (84%) individuals received prescriptions from Dr. MORET for hydrocodone bitartrate/acetaminophen.

B. Alprazolam statistics:

  i.  Between June 15, 2011 and September 15, 2015, pharmacies in the state of Michigan filled no less than 7,084 prescriptions for 246,015 tablets of alprazolam prescribed by Dr. MORET.

  ii.  Of these 246,015 tablets, 88% were of the 2mg dosage units (the highest dosage), and 11% were of the 1 mg dosage unit. The 1mg and 2mg dosage units are the most commonly diverted dosage units.

  iii.  Between June 15, 2011 and September 15, 2015, pharmacies filled prescriptions for controlled substances prescribed by Dr. MORET for 2,724 unique individuals. Of those 2,724 unique individuals, 1,947 (71.5%) individuals received prescriptions from Dr. MORET for alprazolam.

C. Promethazine/codeine syrup statistics:

  i.  Between June 15, 2011 and September 15, 2015, pharmacies in the state of Michigan filled no less than 9,523 prescriptions for 2,542,860 milliliters of promethazine/codeine syrup prescribed by Dr. MORET.

  ii.  Between June 15, 2011 and September 15, 2015, pharmacies filled prescriptions for controlled substances prescribed by Dr. MORET for 2,724 unique individuals. Of those 2,724 unique individuals, 2,246 (82.5%) individuals received prescriptions from Dr. MORET for promethazine/codeine syrup.

43. The Michigan Automated Prescription System (MAPS) data revealed

several suspect prescribing patterns.

    A. Dr. MORET prescribed a combination of alprazolam, hydrocodone bitartrate/acetaminophen, and promethazine with codeine syrup to over 50% of his patients.

    B. Patients traveled from greater than 25 miles away from cities such as Flint, Kalamazoo, Trenton, and Lansing.

    C. Patients received the highest available dosage of narcotics.

    D. Dr. MORET changed prescribing habits in line with the current street desire, or highest street value, of certain controlled substances.

44. Dr. MORET was previously registered with MAPS as an authorized user. Between October 2011 and January 2013, Dr. MORET requested over 1,000 MAPS reports for the stated reason of "New Patient" or "Drug screen positive for medications not prescribed." As of January 2014, Dr. MORET had stopped requesting MAPS reports for his patients.

45. As of October 2015, Dr. MORET had received 175 letters from MAPS indicating that his patients were receiving similar prescriptions from multiple providers. Dr. MORET received letters for some patients several months in a row.

46. Your Affiant believes these data, based upon your Affiant's analysis of Dr. MORET's MAPS report, are indicative of a doctor engaged in the diversion of controlled narcotics, as previously described.


## APPROXIMATE STREET VALUE


47. Based upon the quantities of controlled substances filled in the state of Michigan, which were prescribed by Dr. MORET between the dates June 15, 2011 and September 15, 2015, as well as the estimated street value of the

most commonly diverted controlled prescription substances, as detailed above, your Affiant estimates that the street values of these controlled substances are as follows.  It should be noted, that the below estimates are only for the most commonly diverted controlled prescription substances, at the most commonly diverted dosage units, and are not all inclusive of all controlled substances, or even all dosage units of these particular controlled substances.  It should also be noted that as detailed above, these estimated street prices are not necessarily indicative of street prices in Metro Detroit, but are more indicative of prices which can be obtained in certain geographical locations, to where controlled prescription substances are often diverted from the Metro Detroit area.

A. Hydrocodone Bitartrate / Acetaminophen:

    i. Tablets containing 7.5mg of hydrocodone (in various combination dosages of acetaminophen):  A total of 121,359 tablets of 7.5 mg hydrocodone bitartrate / acetaminophen tablets at an estimated $5.00 per tablet results in an estimated street value of approximately $606,795.

    ii. Tablets containing 10mg of hydrocodone (in various combination dosages of acetaminophen):  A total of 658,985 tablets of hydrocodone bitartrate / acetaminophen tablets at an estimated $6.00 per tablet results in an estimated street value of approximately $3,953,910.

B. Alprazolam:

    i. 1mg dosage unit: A total of 27,885 tablets of the 1mg dosage unit tablets is equivalent to 27,885 mg of alprazolam.  At an estimated $2.00 per milligram, this results in an estimated street value of approximately $55,770.

    ii.  2mg dosage unit: A total of 216,990 tablets of the 2mg dosage unit tablets is equivalent to 433,980 mg of alprazolam. At an estimated $2.00 per milligram, this results in an estimated street value of approximately $867,960.

  C.  Promethazine/codeine syrup: A total of 85,984 liquid ounces of promethazine / codeine syrup, at an estimated $50 per liquid ounce, results in an estimated street value of $4,299,200.

48. As detailed above, the estimated street values for the most commonly diverted controlled prescription substances, which were filled in the state of Michigan, and prescribed by Dr. MORET between June 15, 2011 and September 15, 2015, amounts to an estimated total street value of $9,783,635.

49. It is the belief of your Affiant that Dr. MORET has demonstrated on numerous occasions, as indicated within this Affidavit, his knowledge that the controlled substances he prescribed were not medically necessary and were therefore likely being diverted.

## MEDICARE PART B BILLING

50. Data received from AdvanceMed in, or around, October 2015 showed that between the dates June 15, 2011 through September 28, 2015, services amounting to a total of $7,367,210.60 were billed to Medicare by VILLIAON for services which were purportedly performed by Dr. MORET at ACS. For these billings, ACS received payment of $3,023,563.65 from the Medicare Program. Detailed analysis of these data revealed facts including, but not limited to, the following:

  A. For the aforementioned total billed services, ACS billed Medicare for

a total of 1,418 Medicare Beneficiaries.

B. The three most common CPT Codes billed to Medicare, for services performed by Dr. MORET, are as follows:

    i. CPT Code 99214 (described as "Established patient office or other outpatient visit, typically 25 minutes"): This CPT code was billed a total of 7,971 times for 681 unique Medicare beneficiaries. The billing of this CPT code resulted in total claims to Medicare of $1,018,853.93 and total reimbursement of $629,630.33.

    ii. CPT Code 96375 (described as "Therapeutic, prophylactic or diagnostic injection"): This CPT code was billed a total of 2,803 times for 38 unique Medicare beneficiaries. The billing of this CPT code resulted in total claims to Medicare of $912,420.00 and total reimbursement of $174,543.98.

    iii. CPT Code 96374 (described as "Therapeutic, prophylactic or diagnostic injection"): This CPT code was billed a total of 2,802 times for 38 unique Medicare beneficiaries. The billing of this CPT code resulted in total claims to Medicare of $262,307.50 and total reimbursement of $155,254.14.

C. The three highest billed CPT Codes billed to Medicare, for services performed by Dr. MORET, are as follows:

    i. CPT Code J1572 (described as "Injection immunoglobulin intravenous"): This CPT code was billed a total of 2,380 times for 38 unique Medicare beneficiaries. The billing of this CPT code resulted in total claims to Medicare of $2,330,146.00 and total reimbursement of $521,556.81.

    ii. CPT Code 99214 (described as "Established patient office or

other outpatient visit, typically 25 minutes"): This CPT code was billed a total of 7,971 times for 681 unique Medicare beneficiaries. The billing of this CPT code resulted in total claims to Medicare of $1,018,853.93 and total reimbursement of $629,630.33.

iii. CPT Code 96375 (described as "Therapeutic, prophylactic or diagnostic injection"): This CPT code was billed a total of 2,803 times for 38 unique Medicare beneficiaries. The billing of this CPT code resulted in total claims to Medicare of $912,420.00 and total reimbursement of $174,543.98.

D. ACS billed established patient CPT codes (99211 – 99215) a total of 8,038 times. Established patient CPT codes are differentiated by the length of face-to-face time with the patient, severity of diagnosis, and complexity of medical decision making. CPT code 99211 requires the least amount of face-to-face time, while 99215 requires the most amount of face-to-face time (typically 40 minutes). Of the 8,038 established patient visits, ACS billed the second highest level of office visit (CPT 99214) over 99% of the time.

E. ACS billed new patient CPT codes (99201-99205) a total of 1,439 times. Every new patient visit was billed as CPT 99204 described as "New patient office or other outpatient visit, typically 40 minutes."

## MEDICARE PART D BILLING

51. As of October 2015, data available through Health Integrity showed that between the dates June 15, 2011 and September 30, 2015, the Medicare program paid approximately $3,401,735.58 for a total of 50,702

prescriptions for medication prescribed by Dr. MORET.

    A. Medicare paid $92,821.12 to fill 4,559 prescriptions for hydrocodone bitartrate/acetaminophen.

    B. Medicare paid $14,085.47 to fill 2,777 prescriptions for alprazolam.

    C. Medicare does not cover prescriptions for promethazine with codeine.

## PROBABLE CAUSE

52. Based on surveillance and confidential source reporting, your Affiant has confirmed that ACS and Dr. MORET are currently operating at 21580 Greenfield Road, Oak Park, Michigan.

53. Interviews with patients and former employees, analyses of claims data, analysis of MAPS, and confidential source operations have generated evidence that Dr. MORET, VILLALON, and AZAR have engaged in a scheme to defraud Medicare and other insurance companies by conspiring to distribute, and did distribute, controlled substances, and conspiring to commit, and did commit, Health Care Fraud, in violation of by knowingly allowing these prescriptions to be paid for under the Medicare program

## INTERVIEW OF MORET

54. Dr. MORET was interviewed by agents of the FBI in 2007 while he was employed at Millennium Clinic in regards to another matter. During the interview, Dr. MORET stated that pain management patients required extra scrutiny and considerable effort and therefore, he evaluated those patients very closely to look for the physical cause of the pain. Dr. MORET indicated

that drug-abusing patients frequently concealed portions of their medical history and did not disclose all of the places they were receiving narcotics. Dr. MORET stated that he would be suspicious if a patient asked for a specific drug or combination of drugs such as Vicodin (a hydrocodone /acetaminophen product), Soma (carisoprodol), and Xanax (alprazolam).

## INTERVIEW OF FORMER PATIENTS

55. In July, 2013, federal agents interviewed Patient 1. Patient 1 stated that during the visits to Dr. MORET he/she obtained prescriptions for medically unnecessary controlled substances from Dr. MORET. Patient 1 stated that Dr. MORET's office ran a different test at each visit, such as an electrocardiogram (EKG), blood tests, or pulmonary function test (PFT). Patient 1 stated that Dr. MORET did not do a "real exam." Patient 1 stated that Dr. MORET asked questions in such a way that the patient knew when to say "yes" in order to get the desired prescription drugs. Patient 1 usually received the same controlled substance prescriptions in addition to maintenance medication at each visit: Lortab (hydrocodone bitartrate/acetaminophen), Xanax (alprazolam), and Phenergan (promethazine with codeine cough syrup).

56. Patient 1 told Dr. MORET that he/she had a cold in order to get a prescription for cough syrup. However, Patient 1 stated that he/she never had bronchitis. Patient 1 stated that if Dr. MORET told Medicare that Patient 1 had bronchitis, it would be false.

57. Patient 1 profited from the illegal street sale of the controlled substances. After each visit, Patient 1 filled the prescriptions and sold the controlled

26

substances to drug dealers including a drug dealer waiting outside Dr. MORET's office in the parking lot. Patient 1 recruited another patient (hereafter Patient 2) to see Dr. MORET for the purpose of Patient 2 receiving prescriptions for medically unnecessary controlled substances.

58. Your Affiant reviewed data from Dr. MORET's MAPS report for Patient 1, which showed that Patient 1 received prescriptions from Dr. MORET for controlled substances on five occasions. On all five occasions, ranging from January 2013 to June 2013, Patient 1 received prescriptions from Dr. MORET for alprazolam 2mg, hydrocodone bitartrate 10 mg/acetaminophen 500 mg, and promethazine with codeine.

59. ACS submitted several claims to Medicare for services purportedly rendered to Patient 1. For Patient 1's January 2013 visit, ACS submitted a claim for to Medicare for the following CPT Codes associated with diagnoses of hypertension, lumbago, and bronchitis: 99204, 93000, 94015, 94016, 94060, 94640, 94664, 94667, and 94760. The rendering provider was Dr. MORET. CPT Code 99204 is described as "New patient office or other outpatient visit, typically 45 minutes." CPT Code 93000 is described as "Routine EKG using at least 12 leads including interpretation and report." CPT Code 94015 is described as "Measurement and graphic recording of amount and speed of breathed air over 30 day period." CPT Code 94016 is described as "Physician interpretation and report of measurement and graphic recording of amount and speed of breathed air over 30 day period." CPT Code 94060 is described as "Measurement and graphic recording of the amount and speed of breathed air, before and following medication administration." CPT Code 94640 is described as "Respiratory inhaled pressure or nonpressure treatment to relieve airway obstruction or for sputum specimen." CPT Code 94664 is described as "Demonstration and/or evaluation of patient use of

aerosol generator, nebulizer, metered dose inhaler or intermittent positive pressure breathing (IPPB) device." CPT Code 94667 is described as "Demonstration and/or evaluation of manual maneuvers to chest wall to assist movement of lung secretions." CPT Code 94760 is described as "Measurement of oxygen saturation in blood using ear or finger device." ACS billed Medicare $432.00 for Patient 1's January 2013 visit of which $370.51 was paid to ACS.

60. ACS submitted several claims to Medicare for services purportedly rendered to Patient 1. For Patient 1's February 2013 visit, ACS submitted a claim for to Medicare for the following CPT Codes associated with diagnoses of hypertension and malaise and fatigue: 99214, 36415, 93925, and 93930. The rendering provider was Dr. MORET. CPT Code 99214 is described as "Established patient office or other outpatient visit, typically 25 minutes." CPT Code 36415 is described as "Insertion of needle into vein for collection of blood sample." CPT Code 93925 is described as "Ultrasound study of arteries and arterial grafts of both legs." CPT Code 93930 is described as "Ultrasound study of arteries and arterial grafts of both arms." ACS billed Medicare $560.00 for this visit of which $495.83 was paid to ACS.

61. ACS submitted several claims to Medicare for services purportedly rendered to Patient 1. For Patient 1's March 2013 visit, ACS submitted a claim for to Medicare for CPT Code 99214 associated with diagnoses of hypertension and bronchitis. The rendering provider was Dr. MORET. CPT Code 99214 is described as "Established patient office or other outpatient visit, typically 25 minutes." ACS billed Medicare $110.00 for this visit of which $110.00 was paid to ACS.

62. ACS submitted several claims to Medicare for services purportedly rendered to Patient 1. For Patient 1's May 2013 visit, ACS submitted a claim for to

Medicare for CPT Code 99214 associated with diagnoses of hypertension and bronchitis. The rendering provider was Dr. MORET. CPT Code 99214 is described as "Established patient office or other outpatient visit, typically 25 minutes." ACS billed Medicare $110.00 for this visit of which $110.00 was paid to ACS.

63. ACS submitted several claims to Medicare for services purportedly rendered to Patient 1. For Patient 1's June 2013 visit, ACS submitted a claim for to Medicare for CPT Code 99214 associated with diagnoses of hypertension and bronchitis. The rendering provider was Dr. MORET. CPT Code 99214 is described as "Established patient office or other outpatient visit, typically 25 minutes." ACS billed Medicare $110.00 for this visit of which $110.00 was paid to ACS.

64. In March, 2013, federal agents interviewed Patient 2. Patient 2 traveled to Michigan from another state for the purpose of receiving pain medication because pain medication was much harder to get in Patient 2's home state. Patient 2 stated that in his/her home state, doctors made patients go through a pain management program and prescribed smaller amounts of drugs and fewer numbers of pills. Patient 1 took Patient 2 to see Dr. MORET in march 2013. In exchange for taking Patient 2 to see Dr. MORET, Patient 2 was supposed to give Patient 1 some of the money from selling the prescriptions in Patient 2's home state.

65. When Patient 2 arrived at ACS in to see Dr. MORET, Patient 2 was advised by the receptionist that Patient 2 had to pay a yearly deductible of $147 in order to see Dr. MORET. Patient 2 left the clinic and went to a bank to withdraw the money in order to pay the $147. Patient 1 explained to Patient 2 that he/she also had to pay the deductible during a previous visit

29

66. Patient 2's vital signs taken were taken and EKG and PFT administered prior to seeing the doctor. Dr. MORET gave Patient 2 a brief exam, which entailed listening to Patient 2's heart and lungs, and examining Patient 2's back. Patient 2 told Dr. MORET about an issue with his/her lumbar spine. Dr. MORET prescribed Patient 2 Lortab (hydrocodone bitartrate/acetaminophen), Xanax (alprazolam), and Phenergan (promethazine with codeine cough syrup). Patient 2 estimated that Dr. MORET spent approximately 10-15 minutes with Patient 2. Patient 2 stated that Dr. MORET was "like a real doctor" because he asked questions and was concerned about Patient 2's smoking. When Patient 2 left Dr. MORET's office, a man in the parking lot tried to buy the prescription for the cough syrup.

67. Your Affiant reviewed data from Dr. MORET's MAPS report for Patient 2, which showed that Patient 2 received prescriptions from Dr. MORET for controlled substances on one occasion. Patient 2 received prescriptions from Dr. MORET for alprazolam 2mg, hydrocodone bitartrate 10 mg/acetaminophen 500 mg, and promethazine with codeine.

68. Your Affiant reviewed Medicare claims data for Patient 2. Your Affiant was unable to locate any claims submitted to Medicare for Patient 2's visit.

69. In August 2015, federal agents interviewed a former patient (hereafter Patient 3). Patient 3 knew one of the employees at ACS, was in between doctors, and needed some medication. Patient 3 stated he/she saw Dr. MORET at ACS a few times. Patient 3 took Xanax for anxiety and pain medication as needed for pain. When Patient 3 saw Dr. MORET, Dr. MORET asked, "What are you here for?" Patient 3 brought paperwork and an MRI from a prior automobile accident to the first visit, but Dr. MORET did not ask to see any of the documents. For the physical exam, Dr. MORET

listened to Patient 3's chest and asked about pain. Patient 3 stated that he/she did not ask for any cough syrup, but Dr. MORET wrote out a prescription for cough syrup anyway. Dr. MORET also wrote Patient 3 a prescription for 2 mg Xanax; however, Patient 3 only needed 1 mg Xanax. Patient 3 stated that he/she had to cut the pills in half in order to take the proper dose. Patient 3 stated, "He's [Dr. MORET] is a doctor, but he doesn't care about me." Patient 3 also opined that Dr. MORET should not be practicing and should be in handcuffs.

70. Because Patient 3 knew one of the employees at ACS, Patient 3 often stopped by the clinic. Patient 3 was approached by patients outside the clinic trying to sell their prescriptions to Patient 3. Patient 3 described ACS as a "circus" and a "drug house operation." Patient 3 saw patients lined up outside the clinic waiting for the clinic to open and Dr. MORET to arrive.

71. Your Affiant reviewed data from Dr. MORET's MAPS report for Patient 3, which showed that Patient 3 received prescriptions from Dr. MORET for controlled substances on five occasions. In June 2012, July 2012, and August 2012, Patient 3 received prescriptions for promethazine with codeine cough syrup and hydrocodone bitartrate 7.5 mg/acetaminophen 750 mg. In February 2014, Patient 3 received prescriptions for alprazolam 2 mg, hydrocodone bitartrate 7.5 mg/acetaminophen 750 mg, and promethazine with codeine cough syrup. In April 2014, Patient 3 received a prescription for promethazine with codeine cough syrup.

72. Your Affiant reviewed Medicare claims data for Patient 3. Your Affiant was unable to locate any claims submitted to Medicare for Patient 3's visits. Patient 3 stated that he/she was seen "on the house" because of Patient 3's association with one of the employees. Patient 3 did not have Medicare

insurance. Your Affiant has not been able to determine if another insurance company was billed for services provided to Patient 3.

## CONFIDENTIAL HUMAN SOURCE ACTIVITY

73. On November 8, 2013, Confidential Source (hereafter CS1) entered ACS, 21580 Greenfield Road, Oak Park, Michigan, and attempted to see Dr. MORET in order to obtain medically unnecessary prescriptions for controlled substances. CS1 has provided information to your Affiant, as well as other federal agents, which has been deemed to be truthful and reliable. CS1 had previously seen Dr. MORET at ACS prior to becoming a CS. CS1 was equipped with a recording device and your Affiant has reviewed this recording. When CS1 arrived at the clinic, an unidentified man (hereafter UM1) in the parking lot called CS1 over. UM1 introduced himself and asked, "You want to get rid of anything when you leave out of here today?" UM1 also asked, "What are you getting?" CS1 responded with prices for cough syrup, Lortab, and Xanax, to which UM1 responded, "I'll buy." CS1 replied that someone else was already purchasing the prescriptions and entered the clinic. After a period of time waiting in the lobby, CS1 was called back to have vital signs taken. After the employee recorded the vital signs, CS1 was taken to an exam room. When Dr. MORET entered the exam room, he sat in a chair and never physically examined CS1. Dr. MORET inquired how CS1 was feeling, to which CS1 responded that he/she was "feeling good." Dr. MORET asked a few general questions and never asked about any pain. The duration of the visit with Dr. MORET lasted less than five minutes. CS1 was provided with the following prescriptions for controlled substances: Xanax, Lortab, and Phenergan with codeine cough

syrup. Dr. MORET also wrote CS1 prescriptions for several non-controlled medications. Dr. MORET never discussed the purpose of any of the medications nor any risks associated with the medications. After leaving the clinic, CS1 was approached by another unidentified man (hereafter UM2) in the parking lot across the street. UM2 asked, "Anything you want to get rid of?" CS1 declined to sell the prescriptions. UM2 stated, "Man, I'll buy anything. I'll buy it. I got the money." After CS1 again declined to sell the prescriptions, UM2 left.

74. ACS submitted a claim for CPT Code 99214 to Medicare for CS1's November 8 visit. The rendering provider was Dr. MORET. CPT Code 99214 is described as "Established patient office or other outpatient visit, typically 25 minutes." ACS billed Medicare $112.00 for this visit of which $86.44 was paid to ACS.

75. On December 18, 2013, CS1 again arrived at ACS and attempted to see Dr. MORET in order to obtain medically unnecessary prescriptions for controlled substances. CS1 was equipped with a recording device and your Affiant has reviewed this recording. CS1 entered the clinic with several other patients as soon as the clinic opened in the morning. After a period of time waiting in the lobby, CS1 was called back to have vital signs taken and an electrocardiogram (EKG) administered. CS1 asked to delay the EKG to a subsequent visit. After the employee recorded the vital signs, CS1 was taken to an exam room. When Dr. MORET entered the exam room, he sat in a chair and never physically examined CS1. Dr. MORET inquired if CS1 had any back or knee problems and CS1 stated that his/her back and knees were still problematic. The visit was brief, lasting approximately five minutes. During the visit, Dr. MORET spent most of the time writing in the patient chart. CS1 was provided with the following prescriptions for controlled

substances: Xanax, Lortab, and Phenergan with codeine cough syrup. Dr. MORET also wrote CS1 prescriptions for Keflex, Pro-Air inhaler, vitamin D, folic acid, and Claritin. Dr. MORET never discussed the purpose of any of the medications nor any risks associated with the medications.

76. ACS submitted a claim for CPT Code 99214 to Medicare for CS1's December 18, 2013 visit. The rendering provider was Dr. MORET. CPT Code 99214 is described as "Established patient office or other outpatient visit, typically 25 minutes." ACS billed Medicare $112.00 for this visit of which $86.44 was paid to ACS.

77. On January 29, 2014, CS1 arrived at ACS with an undercover law enforcement officer (hereafter UC1), and both CS1 and UC1 attempted to see Dr. MORET in order to obtain medically unnecessary prescriptions for controlled substances. CS1 and UC1 were equipped with recording devices and your Affiant has reviewed these recordings. CS1 and UC1 entered the clinic with several other patients as soon as the clinic opened. After a period of time waiting in the lobby, CS1 was called back to have vital signs taken and an employee administered a pulmonary function test (PFT) before seeing the doctor. CS1 was taken to an exam room. When Dr. MORET entered the exam room, he sat in a chair and never physically examined CS1. Dr. MORET inquired if CS1 had any allergies and if CS1 had ever had an eye exam. Dr. MORET explained to CS1 that there was a shortage of Lortab and thus he would be prescribing Norco instead. Dr. MORET explained that Norco was basically the same as Lortab. Dr. MORET never discussed any underlying health issues with CS1, such as high blood pressure; despite the fact that Dr. MORET's medical assistant told CS1 that his/her blood pressure was "super high." Dr. MORET's visit with CS1 was brief, lasting approximately five minutes. CS1 was provided with the following

34

prescriptions for controlled substances: Xanax, Norco, and Phenergan with codeine cough syrup. Dr. MORET also wrote CS1 prescriptions for Plendil, Flonase, Claritin, HCTZ, and aspirin. Dr. MORET never discussed the purpose of any of the medications other than to explain that Norco was similar to Lortab. While sitting in the waiting room, CS1 was solicited by a recruiter for home health services. CS1 was offered $100 for his/her Medicare number and an additional $110 for receiving home health services.

78. ACS submitted a claim for to Medicare for CS1's January 29, 2014 visit for the following CPT Codes: 99214, 94015, 94016, 94060, 94640, 94664, 94667, and 94760. The rendering provider was Dr. MORET. CPT Code 99214 is described as "Established patient office or other outpatient visit, typically 25 minutes." CPT Code 94015 is described as "Measurement and graphic recording of amount and speed of breathed air over 30 day period." CPT Code 94016 is described as "Physician interpretation and report of measurement and graphic recording of amount and speed of breathed air over 30 day period." CPT Code 94060 is described as "Measurement and graphic recording of the amount and speed of breathed air, before and following medication administration." CPT Code 94640 is described as "Respiratory inhaled pressure or nonpressure treatment to relieve airway obstruction or for sputum specimen." CPT Code 94664 is described as "Demonstration and/or evaluation of patient use of aerosol generator, nebulizer, metered dose inhaler or intermittent positive pressure breathing (IPPB) device." CPT Code 94667 is described as "Demonstration and/or evaluation of manual maneuvers to chest wall to assist movement of lung secretions." CPT Code 94760 is described as "Measurement of oxygen saturation in blood using ear or finger device." ACS billed Medicare $324.00 for this visit of which $221.23 was paid to ACS.

79. After a period of time waiting in the lobby, UC1 was called back to have vital signs taken and an employee administered a PFT and an EKG prior to seeing the doctor. After the tests, UC1 was taken to an exam room. When Dr. MORET entered the exam room, he inquired why UC1 was on disability and conducted a very brief physical exam. Dr. MORET inquired if UC1 needed any prescriptions. UC1 asked for Lortab and an inhaler. Dr. MORET explained that there was a shortage of Lortab and thus he would be prescribing Norco instead. Dr. MORET explained that Norco was basically the same as Lortab. Dr. MORET's visit with UC1 was brief, lasting approximately five to seven minutes. UC1 was provided with the following prescriptions for controlled substances: Norco and Phenergan with codeine cough syrup. Dr. MORET also wrote UC1 prescriptions for vitamin D, folic acid, Pro-Air inhaler, and Flexeril.

80. ACS submitted a claim for to Medicare for UC1's January 29, 2014 visit for the following CPT Codes: 99204, 93000, 94015, 94016, 94060, 94640, 94664, 94667, and 94760. The rendering provider was MORET. CPT Code 99204 is described as "New patient office or other outpatient visit, typically 45 minutes." CPT Code 93000 is described as "Routine EKG using at least 12 leads including interpretation and report." CPT Code 94015 is described as "Measurement and graphic recording of amount and speed of breathed air over 30 day period." CPT Code 94016 is described as "Physician interpretation and report of measurement and graphic recording of amount and speed of breathed air over 30 day period." CPT Code 94060 is described as "Measurement and graphic recording of the amount and speed of breathed air, before and following medication administration." CPT Code 94640 is described as "Respiratory inhaled pressure or nonpressure treatment to relieve airway obstruction or for sputum specimen." CPT Code 94664 is

36

described as "Demonstration and/or evaluation of patient use of aerosol generator, nebulizer, metered dose inhaler or intermittent positive pressure breathing (IPPB) device." CPT Code 94667 is described as "Demonstration and/or evaluation of manual maneuvers to chest wall to assist movement of lung secretions." CPT Code 94760 is described as "Measurement of oxygen saturation in blood using ear or finger device." ACS billed Medicare $437.00 for this visit of which $281.76 was paid to ACS.

81. On February 28, 2014, UC1 again arrived at ACS and attempted to see Dr. MORET in order to obtain medically unnecessary prescriptions for controlled substances. UC1 was equipped with a recording device and your Affiant has reviewed this recording. UC1 arrived at the office and provided identification to an employee at the front window. After waiting approximately 30 minutes, UC1 was called to the front window and advised that the doctor would not see UC1. UC1 was given a letter. The letter dated February 3, 2014, was written on ACS letterhead and stated:

> "This letter is to inform you that I will no longer be your physician and will stop providing medical care to you effective immediately. I suggest you consult the local pain management referral service, you county medical society, or the yellow pages of your telephone book as soon as possible so that you may find another physician who will assume responsibility for your care. I will be pleased to assist the physician of your choice by sending him or her a copy of your medical records. Sincerely, Rodney Moret."
>
> "You must go to pain clinic."[handwritten]

82. On two occasions in March 2014, UC1 went to ACS and attempted to obtain a copy of his/her patient file. The first time, an employee at the front desk refused to give UC1 the patient file because the office manager was not there. On the second attempt, the office manager, who identified herself as Jellie (later identified from a driver's license photograph as VILLALON), refused to give UC1 a copy of the patient file without a signed medical release authorization from another physician. The office manager also stated that she could not give UC1 the patient file because of HIPAA regulations. In March 2014, UC1 obtained a signed "Release of Medical Records" form from a physician. The form was faxed to ACS twice. The form requested the records be made available for pickup or be faxed over to the doctor's office. UC1 later contacted ACS via telephone to inquire about picking up the records. The call was made during normal business house, but the call went to voice mail. UC1 left a message requesting a return call. No one from ACS ever contacted UC1, and no medical records were received by the requesting physician.

83. Approximately one month later in April 2014, ACS closed for several months. Two former employees (interviews are more fully described later in this affidavit) stated that VILLALON fired all the employees and closed the clinic for several months. In September 2014, a patient informed federal agents that he/she had received a postcard in the mail from ACS indicating that the clinic had re-opened. The patient stated that the postcard was received in July or August 2014.

84. On May 29 2015, a Confidential Source (hereafter CS2) arrived at ACS and attempted to see Dr. MORET in order to obtain medically unnecessary prescriptions for controlled substances. CS2 has provided information to your Affiant, as well as other federal agents, over a number of years, which

38

has been deemed to be truthful and reliable. CS2 was equipped with a recording device and your Affiant has reviewed this recording. There were several patients waiting in the waiting room when CS2 arrived. When CS2 checked in at the front window, an employee told CS2 that Dr. MORET only accepted one new patient per day, and CS2 would have to come back on another day.

85. On June 4, 2015, CS2 arrived at ACS and again attempted to see Dr. MORET in order to obtain medically unnecessary prescriptions for controlled substances. CS2 was equipped with a recording device and your Affiant has reviewed this recording. CS2 arrived before the clinic opened in order to be the first new patient. CS2 was approached by an unidentified man (hereafter UM3) in the parking lot. UM3 offered to buy CS2's prescriptions. CS2 stated that he/she did not know what prescriptions he/she would get. UM3 replied, "You are gonna get Norco 10 and you gonna get eight ounce syrup." UM3 later stated, "I know what you gonna get. This is my doctor bro. I do this. You gonna get Norcos and you gonna get cough syrup. I'm gonna give you $225 for the Norcos and $200 for the cough syrup." UM3 also said that the receptionist knew him and therefore he could help CS2 to be seen by the doctor. UM 3 stated, "I been on this shit for eight years. I know this doctor when they was in Livonia. I know everybody, all the doctors, all the patients, everybody." UM3 said that he worked with over 53 patients. After an employee arrived and opened the clinic, CS2 and UM3 went inside.

86. After a period of time waiting in the lobby, CS2 was called back to have vital signs taken, as well as having EKG and PFT administered before seeing the doctor. After the tests were administered, CS2 was taken to an exam room. When Dr. MORET entered the exam room, he stood in the corner of

the room. Dr. MORET took CS2's medical history and current prescriptions. Dr. MORET also briefly looked at CS2's lower legs and listened to CS2's heart and lungs. CS2 told Dr. MORET that he/she had injured his/her back while lifting weights when CS2 was much younger. Dr. MORET asked what medication CS2 took for pain. CS2 replied, "Nothing right now." CS2 indicated that he/she had taken something in the past. Dr. MORET stated, "Norco. Norco is a good drug, strong medication for pain." CS2 replied that he/she had previously used Lortab. Dr. MORET explained that Lortab was not on the market anymore, and Norco was same as Lortab. Dr. MORET explained that Norco came in several dosages: 5 mg, 7.5 mg, and 10 mg. Dr. MORET stated, "The real pure stuff for the pain is the number 10." As Dr. MORET was leaving the room, CS2 asked if Dr. MORET would write a prescription for a cough. Dr. MORET replied, "For the cough, yes." During the course of the examination, CS2 only coughed two times, both of which occurred when Dr. MORET instructed CS2 to cough. Dr. MORET gave CS2 a referral for an MRI. CS2 left ACS with prescriptions for Norco, Phenergan with codeine cough syrup, Keflex, vitamin D, folic acid, ProAir inhaler, and Lacticane lotion. Dr. MORET never discussed any risks associated with the medications. Dr. MORET spent approximately 15 minutes with CS2. Throughout most of the visit, Dr. MORET stood in the corner writing in the patient chart.

87. ACS submitted a claim to Medicare for CS2's June visit for the following CPT Codes: 99204, 93000, 94015, 94016, 94060, 94640, 94664, 94667, and 94760. The rendering provider was MORET. CPT Code 99204 is described as "New patient office or other outpatient visit, typically 45 minutes." CPT Code 93000 is described as "Routine EKG using at least 12 leads including interpretation and report." CPT Code 94015 is described as "Measurement

40

and graphic recording of amount and speed of breathed air over 30 day period." CPT Code 94016 is described as "Physician interpretation and report of measurement and graphic recording of amount and speed of breathed air over 30 day period." CPT Code 94060 is described as "Measurement and graphic recording of the amount and speed of breathed air, before and following medication administration." CPT Code 94640 is described as "Respiratory inhaled pressure or nonpressure treatment to relieve airway obstruction or for sputum specimen." CPT Code 94664 is described as "Demonstration and/or evaluation of patient use of aerosol generator, nebulizer, metered dose inhaler or intermittent positive pressure breathing (IPPB) device." CPT Code 94667 is described as "Demonstration and/or evaluation of manual maneuvers to chest wall to assist movement of lung secretions." CPT Code 94760 is described as "Measurement of oxygen saturation in blood using ear or finger device." ACS billed Medicare $427.00 for this visit of which $277.13 was paid to ACS.

88. On August 19, 2015, CS2 again arrived at ACS and attempted to see Dr. MORET in order to obtain medically unnecessary prescriptions for controlled substances. CS2 was equipped with a recording device and your Affiant has reviewed this recording. After a period of time waiting in the lobby, CS2 was called back to have vital signs taken. Shortly thereafter, CS2 was taken to an exam room. When Dr. MORET entered the exam room, he sat in a chair and never physically examined CS2. Dr. MORET did not review CS2's test results from the last visit. Dr. MORET asked about the previous referral for an MRI. CS2 stated that he/she forgot to get the MRI, so Dr. MORET said that he would write another referral for an MRI. Dr. MORET did not ask CS2 about any pain or soreness. Dr. MORET spent approximately 5 minutes with CS2. CS2 left ACS with another referral for

41

an MRI and prescriptions for Norco, Phenergan with codeine, as well as Prilosec, Neurontin, vitamin D, folic acid, Lisinopril, Lasix, potassium, and Claritin.

89. ACS submitted a claim for CPT Code 99214 to Medicare for CS2's August visit. The rendering provider was MORET. CPT Code 99214 is described as "Established patient office or other outpatient visit, typically 25 minutes." ACS billed Medicare $175.00 for this visit of which $105.94 was paid to ACS.

## INTERVIEWS OF FORMER EMPLOYEES

90. On August 12, 2015, federal agents interviewed a former employee (hereafter Employee 1) of ACS. Employee 1 interviewed with and was hired by VILLALON to work at JP ADVANCED SERVICES, located at 31705 Plymouth Road, Livonia, Michigan, in January 2011. Employee 1 reported that the clinic was owned by AZAR and VILLALON, husband and wife who lived in Florida. Dr. MORET was the sole practitioner at the clinic. In approximately April 2011, the clinic relocated from Livonia to Oak Park and the new location was called ACS. AZAR said that he wanted to move the clinic to a larger building so more patients could be seen. Employee 1 stated that VILLALON and AZAR hired family members who resided in Florida to work at the clinic in Livonia, Michigan. After moving to the Oak Park location, Employee 1 was promoted to office manager at ACS and was also responsible for starting infusion treatments on the HIV patients. Initially, ACS saw both Medicare patients and cash patients. However, by the end of 2011, Dr. MORET decided that he did not want to see cash patients any more. After that point, ACS only accepted Medicare patients. Employee 1

stated at the beginning of each year the clinic collected the deductible from the Medicare patients prior to the patient seeing Dr. MORET. The clinic accumulated approximately $5,000 - $6,000 in cash for the deductible.

91. Employee 1 stated that the Livonia clinic remained open for a short period of time, and a female doctor was hired to see patients at the Livonia location. AZAR told Employee 1 that he had to fire the female doctor because she would not write the prescriptions that he wanted her to write. The Livonia clinic closed in mid-2012.

92. Employee 1 described a typical patient visit:

   **A.** The patient presented insurance information and identification to the front desk.

   **B.** Medicare insurance was verified and any deductible collected. Until the end of 2011, ACS also accepted cash patients.

   **C.** The patient went to the back of the clinic for vital signs and tests. All new patients received an EKG and PFT. Established patients received EKG, PFT, or Doppler tests according to a regular schedule.

   **D.** After the tests, the patient went to an exam room. Shortly thereafter, the patient came out of the exam room.

   **E.** Dr. MORET wrote out the prescriptions and gave them to the front desk to give to the patient.

93. Employee 1 estimated that Dr. MORET spent five minutes in the exam room with patients. Employee 1 stated, "Physical exam, yeah right." Employee 1 stated that Dr. MORET did not function like a "real doctor" because Dr. MORET never referred patients out to other providers, he never discussed exams and tests with patients, and he wrote the same prescriptions for every patient – Lortab, Xanax, and Phenergan with codeine cough syrup. Dr. MORET then switched every patient to Norco (instead of Lortab), Xanax,

43

and Phenergan with codeine cough syrup. Dr. MORET also wrote prescriptions for "maintenance medications."

94. Employee 1 stated that pharmacies routinely called ACS to verify prescriptions. Some of the pharmacies said that they would not fill the prescriptions for controlled substances without maintenance medications. Employee 1 learned that some patients were not bothering to fill the prescriptions for the maintenance medications.

95. Employee 1 stated that Dr. MORET received letters from MAPS at his home about patients receiving prescriptions for controlled substances from other doctors. Even though Dr. MORET received MAPS letters about patients doctor shopping, Dr. MORET, VILLALON, and AZAR never implemented running MAPS on ACS' patients. Employee 1 stated that he/she was aware of MAPS because Dr. MORET used the MAPS documents to discharge patients. However, Dr. MORET seemed to pick and choose which patients to discharge. The HIV infusion patients were never discharged even after MAPS sent letters about doctor shopping. Other times, Dr. MORET saw a new patient, wrote the patient prescriptions for controlled substances, and the same day told the office staff to discharge the patient.

96. In July 2013, Employee 1 filed a police report with Oak Park Police Department because there were men outside in the parking lot trying to solicit patients for their prescriptions. Some of the patients complained to the office staff. Employee 1 told VILLALON, who said to call the police. Employee 1 Before calling the police, Employee 1 confronted one of the men in the parking lot.

97. At various times, Employee 1 also informed Dr. MORET about the solicitation activity in the parking lot. Employee 1 stated that she even

showed Dr. MORET what was going on in the parking lot. One time, Dr. MORET told Employee 1 to call the police.

98. Employee 1 stated that it was readily apparent to everyone in the clinic what was going on. Employee 1 referred to the patient recruiters as "regulars." The "regulars" came into the clinic all the time to check on the status of their patients, and the "regulars'" patients were always on their cell phones with the recruiters updating them on the status such as they were about to receive their prescriptions or they were ready to be picked up. Sometimes the "regulars" asked the employees about how many people they could bring the next day. Employee 1 stated there may have been a relationship between VILLALON, AZAR, MORET and some of the "regulars". Employee 1 stated she observed a female "regular" go into VILLALON's office and meet with VILLALON and AZAR on several occasions. Employee 1 also observed another male "regular" who brought two or three patients to the clinic meet with VILLALON and AZAR. Employee 1 told VILLALON and AZAR about the "regulars" in the parking lot soliciting patients and passing money. Employee 1 told VILLALON and AZAR that the patients were being solicited because Dr. MORET wrote prescriptions for controlled substances. Employee 1 told VILLALON that he/she was concerned that t Dr. MORET wrote the same prescriptions for every patient. VILLALON's response to Employee 1's concerns was either to act unconcerned or to say that Dr. MORET could write the prescriptions because of the patients' medical conditions.

99. One of Employee 1's job duties involved starting infusions for the HIV patients. Dr. MORET trained Employee 1 on how to start the infusions after she was hired. For infusion patients, Employee 1 filled out an infusion sheet documenting the patient's vital signs at the top of the form and the

45

medications administered. There was a place at the bottom of the form for Dr. MORET's signature. Employee 1 stated that sometimes the HIV infusion patients told Employee 1 that they did not want to receive the infusion and that they only wanted to get their prescriptions. Employee 1 stated that if the patient did not want the infusion, then the infusion was not administered. In the cases where the infusion patients did not receive infusion, Employee 1 only documented the patients' vital signs at the top of the infusion sheet. The section of the form containing the medications administered was left blank.

100.　　Employee 1 became aware that another employee (Employee 2) was filling out billing sheets for the patients which had not received any infusions as if the patients had in fact received infusions. Employee 1 saw that there was different handwriting on the section of the form containing the medications administered. Employee 1 told Employee 2 that if someone else's handwriting was on the section of the form listing the administered medications, then the patient did not receive an infusion. Employee 1 stated that the infusion patients skipped infusions "all the time." Employee 1 estimated that Medicare was billed for infusions not rendered at least one time for each infusion patient.

101.　　On October 21, 2015, federal agents conducted a follow-up interview with Employee 1. Employee 1 stated the money collected from cash patients was given to VILLALON and/or AZAR. Either VILLALON or AZAR would divide the money into three piles and VILLALON, AZAR and Dr. MORET each received a portion of the money. Employee 1 further stated the cash received by the clinic for the deductibles was held at the clinic until VILLALON or AZAR arrived in Michigan. However, Dr. MORET wanted his percentage of the cash on a daily basis. The employees calculated Dr.

MORET's percentage and put the money into an envelope which Dr. MORET collected on a daily basis.

102.     On August 26, 2015, federal agents interviewed a former employee (hereafter Employee 2) of ACS. Employee 2 was interviewed, hired, and trained by VILLALON in or around April 2011. VILLALON trained Employee 2. Dr. MORET was the medical provider at the clinic. Before the clinic opened for the day, patients lined up outside. Employee 2's duties included checking-in patients, finishing patient charts, preparing superbills[1], answering phone calls, and writing in patients' names on prescriptions.

103.     Employee 2 stated that Dr. MORET prepared batches of pre-filled out prescriptions for promethazine with codeine, Lortab or Norco, and Xanax. Employee 2 was responsible for writing the patient's name and date of birth on the prescriptions before giving them to the patient. Dr. MORET kept a blank prescription pad with him to write prescriptions for maintenance medications.

104.     VILLALON told Employee 2 that the clinic only accepted Medicare insurance or cash. Cash patients paid $150 for three prescriptions: Xanax, Lortab or Norco, and promethazine with codeine cough syrup.

105.     Employee 2 stated that it was routine for Dr. MORET to see 25-30 patients during the hours of 9:00 am and 2:30 pm. Employee 2 stated that Dr. MORET asked the patients questions, and the patient charts did not reflect any physical exam. Employee 2 estimated that Dr. MORET spent 5-10 minutes with each patient. Employee 2 stated that Dr. MORET seemed to write the same or similar notes in the patient charts during each patient visit.

---

[1] A superbill is a medical form used to detail the services rendered by medical practitioner during a patient visit. The superbill generally contains the CPT code for the services rendered and a section for the patient's information.

Employee 2 felt like the patient charts were all filled out the same way. The patients all had the same diagnoses of hypertension, bronchitis, and/or back pain. Employee 2 opined that Dr. MORET "did not function like a real doctor;" and all Dr. MORET did was "write scripts."

106. Employee 2 stated that patient recruiters, who Employee 2 referred to as "driver boys," brought patients to ACS. One particular "driver boy" brought several cash and Medicare patients per day. The "driver boy" paid the money for the cash patients directly to Employee 2 or sometimes the patients gave the money to Employee 2. Employee 2 also saw some "driver boys" give cash for the cash patients directly to VILLALON.

107. Employee 2 described the "driver boys" as moving freely between the parking lot and clinic lobby. Employee 2 witnessed patients selling their prescriptions to the drivers in the lobby and at the front door. Employee 2 witnessed some of the drivers pay cash directly to VILLALON. VILLALON and AZAR saw and knew that the drivers were in the lobby and the parking lot. Dr. MORET also knew about the drivers because he had to "wade" through the mass of people in the parking lot and lobby to get into the clinic. Employee 2 told AZAR about the problem with the drivers out the parking lot, and AZAR knew what the driver's were doing [buying prescriptions].

108. Employee 2 took phone calls from pharmacies to verify prescriptions. Some pharmacies would not fill prescriptions written by Dr. MORET. Some pharmacies told Employee 2 that a particular patient was getting controlled substances from other clinics/doctors. Each time, Employee 2 told Dr. MORET and VILLALON. Sometimes Dr. MORET discharged the patient, other times he did not. Sometimes VILLALON discharged the patient, other times she did not. MAPS was not used at the clinic, nor were patients administered urine drug tests.

48

109.    Employee 2 stated that HIV patients came to ACS to receive their prescriptions for controlled substances. The HIV patients were generally supposed to receive an infusion treatment as well. At one time or another, an infusion treatment was billed for most or possibly all of the HIV patients but never rendered.

110.    Employee 2 stated that if the infusion paperwork was completed by Employee1 then an infusion was administered. However, if the infusion paperwork was only in Dr. MORET's handwriting, then no infusion occurred and the documentation was falsified. Regardless of the handwriting on the infusion paperwork, Employee 2 completed the superbills as if an infusion occurred. Employee 1 became aware that Employee 2 was sending superbills to VILLALON for infusion treatments that were not rendered. Employee 1 told VILLALON about the infusion services not being rendered. Employee 2 stated that VILLALON reacted with "a red face, a shake of her head and an audible exhale." VILLALON then spoke to Dr. MORET in Spanish about the matter. Employee 2 reported that nothing changed after VILLALON was told about the situation, and the practice of billing for infusion services that were not rendered continued.

111.    Employee 2 stated that VILLALON did the billing for the clinic. If VILLALON was in Michigan, then she did the billing from the clinic. If VILLALON in Florida, she did the billing from a computer at her home.

112.    On October 21, 2015, federal agents conducted a follow-up interview with Employee 2. Employee 2 stated that cash accumulated at the clinic from cash patients and deductibles which were collected at the beginning of each year. The cash from the cash patients was given to VILLALON and/or AZAR, who divided up the money into portions for VILLALON, AZAR, and Dr. MORET. The cash from the collected deductibles accumulated at

49

the clinic until either VILLALON or AZAR came to town. However, Dr. MORET wanted his percentage of the deductible cash on a daily basis. Employee 2 counted the cash from the deductibles and calculated the amount due to Dr. MORET. Employee 2 put the money in an envelope and gave the envelope to Dr. MORET. Dr. MORET removed the money from the envelope, put it in his pocket, and gave the empty envelope back to Employee 2.

## **CONCLUSION**

113.     Your affiant believes that probable cause exists that RODNEY MORET-QUEZADA has conspired to distribute, and distributed, controlled substances outside the course of legitimate medical necessity in violation of Title 21 United States Code Sections 841 and 846, and conspired to commit, and did commit, health care fraud in violation of 18 U.S.C. §§ 1347 and 1349, and as such requests that a warrant be issued for the arrest of RODNEY MORET-QUEZADA.

114.     Your affiant believes that probable cause exists that JELLIE VILLALON has conspired to distribute controlled substances outside the course of legitimate medical necessity in violation of Title 21 United States Code Sections 846, and conspired to commit, and did commit, health care fraud in violation of 18 U.S.C. §§ 1347 and 1349, and as such requests that a warrant be issued for the arrest of JELLIE VILLALON.

115.     Your affiant believes that probable cause exists that JORGE AZAR has conspired to distribute controlled substances outside the course of legitimate medical necessity in violation of Title 21 United States Code Sections 846, and conspired to commit, and did commit, health care fraud in

violation of 18 U.S.C. §§ 1347 and 1349, and as such requests that a warrant be issued for the arrest of JORGE AZAR.

## REQUEST FOR SEALING

116.     It is respectfully requested that this Court issue an order sealing all papers submitted in support of this application, including the application, affidavit, and arrest warrant until:  (a) the fact and particulars of the affidavit must be disclosed, pursuant to the government's legal obligations, to counsel for other individuals who may be arrested in the future; or (b) the government represents that the items covered by this motion can be made public without substantial risk to the safety of defendant or others.  I believe that sealing these documents in this fashion is necessary because the items and information to be seized are relevant to an ongoing investigation of a criminal conspiracy and not all of the targets of this investigation will be searched at this time.  Based upon my training and experience, I have learned that online criminals actively search for criminal affidavits and search warrants via the Internet and disseminate them to other online criminals as they deem appropriate, e.g., by posting them publicly online through the carding forums.  Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.


Respectfully submitted,

Larissa Kramer
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me
on October 27, 2015:


Honorable Anthony P. Patti
United States Magistrate Judge

52